IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

TINA ALLEN,

    Plaintiffs,

v.

    Civil Action 2:15-cv-2825
    CHIEF JUDGE EDMUND A. SARGUS, JR.
    Magistrate Judge Kimberly A. Jolson

DETROIT DIESEL
REMANUFACTURING, LLC,

    Defendant.

## OPINION AND ORDER

This matter is before the Court for consideration of Defendant's Motion for Summary Judgment (ECF No. 19), Plaintiff's Memorandum in Opposition to Defendant's Motion (ECF No. 20), and Defendant's Reply Brief in Support of its Motion (ECF No. 21). For the reasons set for the below, the Court **GRANTS** Defendant's Motion.

I.

Plaintiff Tina Allen was hired by Defendant Detroit Diesel Remanufacturing, LLC, on March 18, 1996, and remained employed there until her termination on July 24, 2014. Detroit Diesel is a remanufacturer of automotive parts that operates a facility near Byesville, Ohio. At the time of her termination, Ms. Allen was employed as a cleaning area parts inspector, whose job duties included inspecting, scraping, repairing, and sanding components for diesel engines.

Ms. Allen suffers from asthma and Chronic Pulmonary Obstructive Disease ("COPD") and frequently suffers "flare-ups" that cause her difficulty breathing. (Compl. ¶ 12, ECF No. 1; Pl.'s Dep. at 75, 81, 254, 261–63, ECF No. 23.) Because she has trouble breathing, she often feels dizzy, light-headed and nauseous. In the warmer weather, Ms. Allen's symptoms worsen.

She cannot run or walk long distances, has a handicapped-parking permit, and utilizes it to park in a handicapped spot at Detroit Diesel's facility.

Because of her COPD, Ms. Allen requested and Detroit Diesel approved leave numerous times from 2008 through 2013 under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.*, ("FMLA"). Ms. Allen also at times suffered "flare-ups" of her COPD while at work. She asked her supervisor, Bob Reed, for the accommodation of going outside for fresh air when she experienced breathing difficulties. Mr. Reed granted her request, giving Ms. Allen permission to step outside without prior approval, at any time she felt it necessary, and did not limit her to any specific amount of time that she could stay outside.

In the final two years of her employment, Ms. Allen accrued multiple attendance violations for her absenteeism. On August 30, 2013, Defendant placed Ms. Allen on a performance improvement plan that focused on her attendance, attitude, and regard for company rules. On October 23, 2013, Ms. Allen was given a written warning and three days off without pay for company attendance policy violations. In the attendance disciplinary action document, it indicates that employees who "receiv[e] five (5) formal attendance disciplinary actions within a two (2) year period are subject to termination." (Attendance Disciplinary Action at 2, ECF No. 19-4.) It further specifies that Ms. Allen had "accumulated 4 formal attendance disciplinary actions. . . . [and that] if [Ms. Allen] receives her 5th [attendance disciplinary action] before 2/5/2015, it can result in job termination." *Id.*

On November 8, 2013, Ms. Allen received a performance evaluation. In that evaluation, Supervisor Reed gave her the lowest possible score for attendance. Mr. Reed, noted that "things still seem to be improving, with the exception of [Ms. Allen's] attendance." (Pl.'s Dep. at 185–87, ECF No. 23, and Ex. 25, ECF No. 23-1 at 181.)

On July 8, 2014, Ms. Allen received another performance evaluation in which Supervisor Reed gave her a rating of "2," indicating she does not consistently meet job requirements, in attendance and conduct. (Pl.'s Dep. at 180, ECF No. 23, and Ex. 24, ECF No. 23-1 at 178.)

In the months preceding her termination, Ms. Allen worked first shift, which started at 6:00 a.m. and ended at 2:00 p.m. On June 10, 2014, she requested that her shift for the following day be moved to 4:00 a.m. to 12:00 p.m. so that she could take her father to a doctor's appointment. Defendant granted her request.

On the morning of June 11, 2014, Production Manager Brent Cork discussed with Supervisor Eric Gander the issue of employees requesting to work hours other than their scheduled shift. Supervisor Gander and Supervisor Reed, Ms. Allen's direct supervisor, both report to Mr. Cork. Mr. Gander told Mr. Cork that Ms. Allen had been at work prior to her regularly scheduled shift that morning. Mr. Reed informed Mr. Gander that the prior day he approved Ms. Allen's request to start at 4:00 a.m. rather than her usual 6:00 a.m. shift start. Mr. Gander noted that he did not see Ms. Allen until approximately 4:40 a.m. even though he was near her workstation at 4:00 a.m. Mr. Cork recalled seeing Ms. Allen in the break room at around 4:50 a.m. This prompted Mr. Cork reviewed the video of the parking lot, which showed only one car enter between 3:40 a.m. and 4:40 a.m. That car arrived at 4:35 a.m. Mr. Cork asked Mr. Reed to follow up with Ms. Allen about what time she arrived at work, which he did later that same morning.

Ms. Allen informed Supervisor Reed that she arrived at work at approximately 3:55 a.m. Ms. Allen informed him that she entered the building through the dock door. The dock door does not shut all the way. Consequently, employees do not have to swipe their badge to enter through that door. Ms. Allen stated that once inside she attempted to clock in, but that neither of

3

the time clocks she tried accepted her badge so she proceeded to her workstation as she did not want to be late. At about 6:00 a.m. Ms. Allen informed John Seckman, her Line Leader, that her badge was not working.

Mr. Reed reported back to Mr. Cork, who recorded his findings in an email sent to Human Resources ("HR") Manager Kathy Mohler. Over the following weeks, Detroit Diesel continued investigating whether Ms. Allen arrived on time on June 11 and, if not, whether she violated Detroit Diesel policy by lying about her arrival time or by any other conduct. Detroit Diesel learned that, on the morning of June 11, 2014, its door access records reflected Ms. Allen entering the building through the "tear down door" three times: 4:27 a.m., 4:35 a.m., and 7:59 a.m. (Pl.'s Dep. at 234, ECF No. 23; Def.'s Mot. for Summ. J., Ex. 9, ECF No. 19-9.) There was no indication that Ms. Allen entered the facility prior to 4:00 a.m. The investigation also showed that Ms. Allen's badge had permitted her to clock in and out without incident on the seven days before and the seven days after June 11.

After this initial investigation, on July 15, 2014, HR Manager Mohler and Production Manager Cork met with Ms. Allen. Ms. Allen explained that she did not recall much about the morning of June 11, 2014, except that she was not late and that her badge did not work when she attempted to clock in. She explained that she had two badges as a result of receiving a second one upon her return from her last FMLA leave. Ms. Allen suggested that she might have had trouble clocking in because she could have accidentally swiped her old identification badge.

On July 21, 2014, HR Manager Mohler, Supervisor Reed, and Plant Manager Todd Moore met with Ms. Allen. Ms. Allen was questioned about the door records that showed multiple door swipes after 4:00 a.m., but none before. Ms. Allen explained that she entered work through the dock door, where no badge activity is recorded. Ms. Allen later testified on

4

deposition that she felt pressured by the management in the meeting to provide information about the morning of June 11, 2014, but that she could not remember details because it had been over a month. She informed management that June 11 could have been the day her daughter dropped her off at work and returned later to deliver her a soda, which Ms. Allen exited and reentered the building to retrieve the drink. She indicated that her daughter texted her to let her know she had returned with the soda. Ms. Allen also identified three individuals, Bud Rich, Joe Dudley, and Bernie Hill, who she believed could confirm that she had arrived at work at 4:00 a.m. and/or that the time clocks periodically do not work. Management spoke with each of these coworkers, but none recalled whether they saw Ms. Allen at work at 4:00 a.m., but explained that some of the time clocks do not regularly work. All three of the gentlemen indicated that they regularly use the "teardown clock" because the others are less likely to function properly. (Pl.'s Mem. in Opp., Ex. E, ECF No. 20-7.)

On July 23, 2014, Ms. Allen again met with Mohler, Reed, Cork, and Moore. Ms. Allen reiterated to them that she believed June 11 was the day that her daughter brought her to work, sent her a text message informing her that she had returned with a soda, and Ms. Allen had gone to the parking lot to retrieve it. The managers asked to see the text message that her daughter had sent to her, and Ms. Allen refused "[b]ecause the phone is [her] personal property." (Pl.'s Dep. 223, ECF No. 23.)

Ms. Allen also reasserted that she entered the facility through the dock door, which was not the door she most often entered through, and added that she was running late. She reaffirmed that she made multiple attempts to swipe one of her badges in the time clock, but was unable to successfully clock in. Management also questioned Ms. Allen about why she was in the break room at 4:50 a.m. and she said was probably getting a soda. Management asked Ms.

5

Allen why she was getting a soda from the break room 20 minutes after getting a soda from her daughter, and she said that she must have gone for a snack, not a soda. When questioned about the second door swipe recorded from her badge between 4:00 a.m. and 5:00 a.m., Ms. Allen said that it could have been because she goes outside frequently because she cannot breathe well.

Detroit Diesel concluded from its investigation that on June 11, Ms. Allen did not arrive at work on time and that she purposely did not use her badge to clock in. Detroit Diesel further concluded that Ms. Allen failed to notify a supervisor that her badge was not working prior to her shift, failed to be at her assigned work place on time, left her work area several times without permission, used her cell phone, and was dishonest during the investigation. Detroit Diesel terminated Allen's employment on July 25, 2014.

Ms. Allen filed this case, alleging that Detroit Diesel terminated her (1) because of her asthma and COPD, and because of her request for accommodation of these physical impairments, and (2) in retaliation for her requesting accommodation for her disability. Based on these allegations, Ms. Allen brings claims for disability discrimination and retaliation in violation of federal and state law. Detroit Diesel has moved for summary judgment on all of Ms. Allen's claims for relief. That motion is ripe for review.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts"). Consequently, the central issue is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234-35 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251-52).

### III.

Ms. Allen brings claims for disability discrimination, retaliation, and failure to accommodate her disability in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. §12101, *et seq.* ("ADA") and Ohio's analogous statute, Ohio Rev. Code § 4112 *et seq.* Courts regularly analyze ADA and state law disability discrimination, retaliation, and failure to accommodate claims together. *Jakubowski v. The Christ Hosp.*, 627 F.3d 195, 201 (6th Cir. 2010).

A.  **Disability Discrimination and Retaliation**

To establish a *prima facie* case of retaliation under the ADA, a plaintiff must "show that (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse employment action." *Bryson v. Regis Corp.*, 498 F.3d 561, 577 (6th Cir. 2007).

"To recover on a claim for discrimination under the ADA, a plaintiff must show that he or she (1) is disabled, (2) otherwise qualified to perform the essential functions of the position, with or without accommodation, and (3) suffered an adverse employment action because of his or her disability." *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016) (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996); *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317, 321 (6th Cir. 2012) (*en banc*) (abrogating *Monette* in part by holding that a plaintiff must show that he or she suffered an adverse employment action "because of" rather than "solely by reason of" disability)). "A plaintiff may do so 'by introducing direct evidence of discrimination, including evidence that the employer relied upon the plaintiff's disability in making its employment decision, or by introducing indirect evidence of discrimination.'" *Id.* (quoting *Monette*, 90 F.3d at 1178 (citation omitted)).

Ms. Allen relies on the indirect method to establish her claims, which adapts the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, burden-shifting framework. *Id.* (citing *Monette*, 90 F.3d at 1179–82).

> To establish a claim for disability discrimination under the indirect method, a plaintiff must first establish a *prima facie* case of discrimination by showing that (1) he or she is disabled, (2) he or she is otherwise qualified for the position, with or without reasonable accommodation, (3) he or she suffered an *892 adverse employment decision, (4) the employer knew or had reason to know of the plaintiff's disability, and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Id.* at 1186; *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011) (reaffirming that

8

> "*Monette* states the proper test" under the indirect method). Once the plaintiff establishes a *prima facie* case under the indirect method, the burden shifts to the defendant to "offer a legitimate explanation for its action." *Monette*, 90 F.3d at 1186. If the defendant does so, the burden then shifts back to the plaintiff, who "must introduce evidence showing that the proffered explanation is pretextual." *Id.*

*Ferrari*, 826 F.3d at 891–92.

Similarly, once a plaintiff makes a *prima facie* showing of retaliation, the burden shifts to the defendant to state a legitimate, nonretaliatory reason for its adverse employment action. *Penny v. UPS,* 128 F.3d 408, 417 (6th Cir. 1997). The plaintiff then bears the ultimate burden of proving that the employer's proffered reason for the action was merely a pretext for retaliation. *Id.*

### 1. *Prima Facie* Showing of Disability Discrimination and Retaliation

The parties disagree as to whether Ms. Allen can make a *prima facie* showing of disability discrimination and/or retaliation. The Court, however, finds it unnecessary to make these determinations. This is because even if Ms. Allen can establish a *prima facie* case of disability discrimination or retaliation, Defendant has offered legitimate nondiscriminatory and nonretaliatory explanations for terminating her and, as explained below, Ms. Allen has failed to introduce evidence sufficient to create a genuine issue of material fact as to whether the explanations are a pretext for disability discrimination and/or retaliation.

### 2. Nondiscriminatory and Nonretaliatory Reasons and Pretext

Detroit Diesel's termination notice lists several independent reasons for terminating Ms. Allen, including but not limited to failing to notify a supervisor of her badge not working prior to her shift, not being at her assigned work place on time, leaving her work area without permission, and a series of incidents, including dishonesty, which combine to define a problem of serious misconduct. Ms. Allen "must now produce sufficient evidence from which a jury

9

could reasonably reject *each* independent reason for why the [defendant] fired her." *Wilson v. Cleveland Clinic Found.*, 579 Fed. Appx. 392, 402 (6th Cir. 2014) (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir.1998) (concluding that although the plaintiff raised doubt as to one of the employer's two articulated nondiscriminatory reasons, such doubt was not sufficient to call into question the employer's other proffered reasons, as "[t]he two justifications and the sources from which they were derived were separate in nature."); *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). *See also Jones v. St. Jude Med. S.C., Inc.*, 504 Fed. Appx. 473, 477–78 (6th Cir. 2012) ("When an employer offers more than one independent, legitimate, nondiscriminatory reason for an adverse employment action, even if one is found to be pretextual but at least one other is not, the defendant employer is still entitled to summary judgment.") (citing *Burks v. Yellow Transp.*, Inc., 258 Fed. Appx. 867, 876 (6th Cir.2008); *Rufo v. Dave & Busters, Inc.*, No. 06–3111, 2007 WL 247891, at *3–4 (6th Cir. Jan. 31, 2007); *Smith v. Chrysler Corp.*, 155 F.3d at 806; *Sims v. Cleland*, 813 F.2d 790, 793 (6th Cir.1987)). Further, when the proffered reasons are independent of each other as they are in the instant action, "the falsity or incorrectness of one may not impeach the credibility of the remaining reason(s)." *Sims*, 813 F.2d at 793.

To survive a motion for summary judgment, Ms. Allen need not definitively prove that Detroit Diesel's reason for terminating her is a pretext for disability discrimination and/or retaliation, but rather "must prove only enough to create a *genuine issue* as to whether the rationale is pretextual." *Whitfield*, 639 F.3d at 260. "Under the law of our circuit, a plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Romans v. Mich. Dep't of Human Servs.*, 668

F.3d 826, 839 (6th Cir. 2012) (quoting *Chen*, 580 F.3d at 400); *see also Smith v. Chrysler Corp.*, 155 F.3d at 805–06 (reciting same standard in ADA case). A plaintiff may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision "to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008) (citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 578 (6th Cir. 2003) (*en banc*)). "To demonstrate pretext, a plaintiff must show *both* [(a)] that the employer's proffered reason was not the real reason for its action, *and* [(b)] that the employer's real reason was unlawful." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (citations omitted).

### a. Proffered Reason Not the Real Reason for Termination

To show that Detroit Diesel's proffered reasons for terminating her were not the real reasons, Ms. Allen contends (i) that the policy violations did not occur, and (ii) that Detroit Diesel's decision was so unreasonable as to cast doubt on its actual motivation.

#### (i) Did the proffered reasons have a basis in fact?

Ms. Allen testified that the policy violations relied upon by Detroit Diesel in its decision to terminate her did not occur. The evidence viewed in the light most favorable to Ms. Allen however, shows otherwise. That is, Ms. Allen admitted both during the investigation and again at her deposition, that without permission she left her work station two or three times between 4:00 a.m. and 5:00 a.m. on June 11, only one of which was for the accommodation of fresh air. She also admitted failing to report her non-functioning badge to a supervisor before starting her shift on June 11. Thus, Ms. Allen admitted, either during the course of the investigation or

11

during deposition, three of the four policy manual rules listed on the notice as being considered in reaching the determination to terminate her employment.

Nevertheless, even if the policy violations did not occur and Detroit Diesel was incorrect in its assessment of the violations, summary judgment is not precluded because "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001); *see also Chen*, 580 F.3d at 401. "In determining whether [a d]efendant[] had an 'honest belief' in the proffered basis for discharge, we examine whether [the defendant] established a 'reasonable reliance' on the particularized facts available to the company in firing [a] [p]laintiff." *Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 502–03 (6th Cir. 2007) (citing *Braithwaite v. The Timken Co.*, 258 F.3d 488, 494 (6th Cir.2001)).

In deciding whether an employer reasonably relied upon particularized facts, the Sixth Circuit explains:

> In deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action. *Cf. Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (explaining that an employee establishes pretext "by showing that the employer's proffered explanation is unworthy of credence."). Although courts should resist attempting to micro-manage the process used by employers in making their employment decisions, neither should they blindly assume that an employer's description of its reasons is honest. When the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse *808 employment action, thereby making its decisional process "unworthy of credence," then any reliance placed by the employer in such a process cannot be said to be honestly held.

*Smith v. Chrysler Corp.*, 155 F.3d at 807–08.

Applying these principles to the facts in the present case, the Court finds that Detroit Diesel reasonably relied on the particularized facts at hand when it terminated Ms. Allen. The uncontroverted evidence before the Court shows that Supervisor Gander did not see Ms. Allen until approximately 4:40 a.m. even though he was near her workstation at 4:00 a.m.; Ms. Allen did not report that her badge failed to work for two hours after her shift began; Ms. Allen's badge worked in the seven days before and after June 11; access records for the door that Allen usually used to enter the facility reflect that she entered the building approximately 30 minutes after her shift began; she admitted using her cell phone to receive text messages on the floor and leaving her work area to retrieve a soda; despite asserting one of the door swipes was attributable to her trip to the parking lot to pick up a soda, Ms. Allen refused to show Detroit Diesel the text message that she claimed preceded her trip outside; Ms. Allen was away from her work area in the break room for a soda or a snack within the first hour of her shift; Ms. Allen had been told only a few days before her first meeting with management about significant attendance issues; and Ms. Allen knew that if she received one more attendance violation before February 5, 2015 she could be terminated.

Ms. Allen failed to produce evidence sufficient to raise any genuine issue as to whether Detroit Diesel's decisional process was unworthy of credence. Detroit Diesel's belief that Ms. Allen was dishonest about what occurred on June 11 was essentially corroborated by Ms. Allen. She alleges that she was confused and unsure of what happened on June 11, she felt pressured to provide information about that morning at the first investigatory meeting which prompted her to think that it may have been the day that her daughter dropped her off at work and went to buy her a soda. To alleviate her confusion, Ms. Allen testified on deposition that "as soon as [she] had this first meeting" she called her daughter to discuss what had happened on June 11. (Pl.'s Dep.

225, ECF No. 23.) Ms. Allen "originally thought that [her] daughter...dropped [her] off" on June 11, but learned from her conversation with her daughter "that it was not that day" that she was dropped off. *Id.* Despite her knowledge that her daughter had *not* dropped her off on June 11, Ms. Allen subsequently told management at both of the following investigation meetings, held July 21 and July 23, that she thought her daughter had dropped her off and brought her back a soda.[1]

### (ii) Was the decision so unreasonable as to cast doubt on actual motivation?

Ms. Allen also argues that Detroit Diesel's decision was pretext for disability discrimination and retaliation because the decision was so unreasonable as to cast doubt on its actual motivation. To support this argument, Ms. Allen posits that Detroit Diesel knew its time clock system was inoperative at times, implying that because of this fact Detroit Diesel should have taken her at her word that she was on time on June 11. Ms. Allen offers evidence that another associate, Penny Rings, was also having badge problems that prevented her from clocking in, and needed to report to a supervisor. And, Ms. Allen cites to evidence showing that the time clocks at the facility sometimes did not work. This evidence, however, reflects that, unlike Ms. Allen, Ms. Rings abided by Detroit Diesel's policy and promptly contacted her supervisor so she that she could be properly clocked in, leaving her supervisor with no reason to

---

[1] Ms. Allen seeks to contradict her earlier deposition testimony with an affidavit submitted in support of her Memorandum in Opposition to Defendant's Motion for Summary Judgment. In her affidavit she avers that she "did not produce a text message to [Detroit Diesel] because one did not exist – a fact she made abundantly clear to Ms. Mohler during the July 23, 2014 meeting." (Pl.'s Mem. in Opp. at 9, ECF No. 20; Pl.'s Aff. ¶¶ 13–15, ECF No. 20-1.) This statement directly contradicts her previous testimony that at the July 23 meeting she told Moore she would not show him the text message "[b]ecause the phone is [her] personal property" and that her daughter brought her to work that day. (Pl.'s Dep. 223, ECF No 23.) It is, however, unnecessary to this Court's determination whether Ms. Allen was dishonest at both the second and third investigatory meetings, or only at the second meeting. The Court merely observes that Detroit Diesel's reasonable reliance upon particularized facts to conclude that Ms. Allen was dishonest ultimately proved to be accurate.

believe she was late to work. Additionally, Ms. Rings' clocking issues appeared to occur with regularity, again unlike Ms. Allen, whose badge worked the seven days prior to and following June 11.

Similarly, the evidence of the other time clock not working was from the interview with Ms. Allen's three coworkers, who all stated that they used the "teardown small components" clock because it is the one that works. (Pl.'s Mem. in Opp., Ex. E, ECF No. 20-7.) Yet, this is the clock that Ms. Allen claimed, during the July 23 meeting, she tried and it did not work. (Pl.'s Dep. at 213, ECF No. 23.) Thus, to the extent Ms. Allen's evidence on the time clock issue provides support for anything, it is another reason for Detroit Diesel to question her explanation of why she failed to clock in on June 11.

### b. Real Reason for Termination is Unlawful

Even if the Court had found that Detroit Diesel's proffered reason for terminating Ms. Allen was not the real reason, it would still be entitled to summary judgment. This is because Ms. Allen has failed to raise any genuine issue of material fact as to whether Detroit Diesel's real reason for terminating her was discriminatory and/or retaliatory animus. Ms. Allen posits that Detroit Diesel's discriminatory intent grew out of her use of FMLA leave and prior requested bereavement leave. Specifically, Ms. Allen states:

> Kathy Mohler, Defendant's Human Resources Manager, was outwardly hostile toward Ms. Allen's use of FMLA leave for her disability. In fact, Ms. Allen was told by a supervisor, Stacy Moore, that Defendant did not want people on FMLA generally. Because Defendant, specifically Kathy Mohler, was sick of Ms. Allen's absences related to her disability, she sought out reasons to terminate Ms. Allen's employment.

(Pl.'s Mem. in Opp. at 2, ECF No. 20.)

Additionally, Ms. Allen contends:

15

> Ms. Mohler was outwardly hostile toward Ms. Allen's use of FMLA for her disability, evident by the fact that she responded to Neuhart's email and said, "When we roll out the new handbook, there will be no more FMLA pending. I know her game." . . . . It is commonly known among the employees that Defendant does not want to accommodate individuals who have disabilities, or individuals who use leave under the FMLA.

*Id.* at 5 (citations omitted).

Finally, to support her position that it was her medical conditions, and not her policy violations that caused Detroit Diesel to terminate her employment, Ms. Allen asserts:

> As evident by the extremely unnecessary investigation launched against Ms. Allen, it is abundantly clear that Mohler was searching for a reason to terminate Ms. Allen's employment in June and July of 2014. Ms. Allen suffered the loss of a family member in June of 2014 and requested bereavement leave to attend the funeral. . . . Rather than allowing her time off to spend time with her family, Ms. Mohler launched an investigation into whether Ms. Allen was actually related enough to the deceased to be permitted to take bereavement leave.

*Id.* at 9–10 (citations omitted).

Ms. Allen's assertions simply do not raise any genuine issue of material fact as to whether Detroit Diesel's real reason was discriminatory or retaliatory animus for several reasons. First, while Ms. Allen casts the investigation as the result of HR Manager Mohler's actions, the evidence shows that the investigation into her attendance on June 11 was born of a conversation between Production Manager Cork and Supervisor Gander.

Second, the comment Ms. Allen contends was made by Stacy Moore is an immaterial, stray comment. Stacy Moore was not a decision maker in Ms. Allen's termination, and the remark was allegedly made years before Allen's termination. *See Dunson v. Hooven-Dayton Corp.*, No. 3:10-cv-441, 2012 U.S. Dist. LEXIS 45991, at *19-20 (S.D. Ohio Mar. 31, 2012) (comments evidencing discriminatory animus may be determined considering "(1) whether the remarks were made by the decision maker or by an agent uninvolved in the challenged decision; (2) whether the remarks were isolated or part of a pattern of biased comments; (3) whether the

remarks were made close in time to the *challenged* decision; and (4) whether the remarks were ambiguous or clearly reflective of discriminatory bias."). Ms. Allen provides no other evidence to support this "commonly known" aversion to permit FMLA leave. Indeed, the evidence shows the opposite. For many years prior to her termination Ms. Allen regularly applied for and was granted FMLA leave with no negative consequences.

Third, Mrs. Mohler cleared Ms. Allen of any violation of the bereavement policy. Simply investigating, and finding no violation of a company policy, does not reflect discriminatory animus.

Last, Ms. Allen highlights Mrs. Mohler's email to Brigit Neuhart in which she indicates that "there will be no more FMLA pending" following the implementation of Detroit Diesel's new HR Policy Manual, and says she "know[s Allen's] game." (Pl.'s Mem. in Opp. at 5, ECF No. 20, and Ex. C, ECF No. 20-5.) On its face, this email does not demonstrate animus based on disability. But even if Mrs. Mohler's email is considered supportive of Ms. Allen's disability discrimination and retaliation claims, the undisputed explanation of it obviates any material dispute of fact.

By way of explanation, Mrs. Mohler's email was a response to an email from Ms. Neuhart documenting Ms. Allen's filing several FMLA claims, despite being told after filing the first FMLA claim that she had not worked enough hours in the previous 12 months to qualify. Under Detroit Diesel's policy at that time, an employee who made a request for FMLA leave would not have points assessed under the attendance policy for any time missed between the FMLA application and determination, regardless of the ultimate determination of eligibility of FMLA. This was known as "FMLA pending." (Decl. of Kathy Mohler ¶ 3, ECF No. 21-2.) An employee who knew he or she was not FMLA eligible could, therefore, avoid accountability for

absenteeism simply by making serial FMLA requests. *Id.* ¶ 4. Detroit Diesel changed the "FMLA pending" policy in its new 2014 HR Policy Manual. *Id.* ¶ 5. Since April 2014, if an employee's FMLA application is not approved, any absences between the application and determination could be modified and assessed points. *Id.* ¶ 6.

   c.   **Conclusion Pretext**

Based on the foregoing, no reasonable jury could find that Detroit Diesel's proffered reasons for terminating Ms. Allen were not the real reasons, and that her asthma, COPD, and request to be accommodated for her disability were the real reasons.

**B.   Failure to Accommodate**

Ms. Allen brings a claim for failure to accommodate her disability. A *prima facie* case for failure to accommodate exists if a plaintiff shows that: (1) she is disabled within the meaning of the ADA; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about his disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation. *Johnson v. Cleveland City Sch. Dist.*, 443 Fed. Appx. 974, 982 – 83 (6th Cir. 2011). Detroit Diesel maintains that it is entitled to summary judgment on this claim because, *inter alia*, Ms. Allen was never denied any requested accommodation. This Court agrees.

Ms. Allen testified that she requested two accommodations from Detroit Diesel: intermittent FMLA leave and stepping outside for fresh air. (Pl.'s Dep. 250, ECF No. 23.) Ms. Allen offers no evidence that she was ever denied either of these accommodations. Again, the evidence is contrary. Ms. Allen regularly, and without any negative consequences, took advantage of both of these requested accommodations.

Consequently, the evidence fails to present a sufficient disagreement to require submission to a jury, and instead is so one-sided that Detroit Diesel must prevail as a matter of law on Ms. Allen's failure to accommodate claim.

IV.

For the reasons set forth above, the Court **GRANTS** Defendant's Motion for Summary Judgment. (ECF No. 19.) The Clerk is **DIRECTED** to **ENTER JUDGMENT** in accordance with this Opinion and Order.

**IT IS SO ORDERED.**

9-28-2017
**DATE**

EDMUND A. SARGUS, JR.
**CHIEF UNITED STATES DISTRICT JUDGE**